[Cite as *State v. Austin*, 2019-Ohio-1185.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MICHAEL L. AUSTIN, JR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 16 MA 0068**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 13 CR 380A

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed

---

*Atty. Paul Gains,* Mahoning County Prosecutor, and *Atty. Ralph M. Rivera*, Assistant Prosecutor, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503-1426, for Plaintiff-Appellee and

*Atty. Timothy Young*, Ohio Public Defender, and *Atty. Stephen P. Hardwick*, Assistant Public Defender, The Midland Building, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

Dated: March 29, 2019

---

**D'APOLITO, J.**

{¶1} Appellant Michael Austin Jr. appeals his convictions and sentence following a jury trial in the Mahoning County Court of Common Pleas for three counts of aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony, with a firearms specification for each count, in violation of R.C. 2941.145(A) (counts one, four, and ten); one count of murder, in violation of R.C. 2903.02, an unclassified felony, with a firearms specification, in violation of R.C. 2941.145(A)(a lesser included offense of the charged crime of aggravated murder)(count eleven); and one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1)(B), with an enhancement based upon a prior felony conviction, a felony of the first degree (count twenty-nine).

{¶2} Appellant was sentenced to life without parole for each of the three aggravated murder convictions, plus three years for each of the corresponding firearms specifications; fifteen years to life for the murder conviction, plus three years for the corresponding firearms specification; and eleven years for the pattern of corrupt activity conviction. Each of the sentences for the substantive convictions was imposed to run consecutively to the others. (11/27/17 J.E.)

{¶3} Appellant argues that the trial court abused its discretion in admitting specific testimonial evidence at trial. He also challenges the constitutionality of his non-reviewable sentences for aggravated murder and murder, and the lawfulness of the imposition of sentences consecutive to a sentence of life without parole. For the following reasons, Appellant's assignments of error are overruled and his convictions and sentence are affirmed.

## THE INDICTMENTS

{¶4} On April 11, 2013, Appellant, his brother Hakeem Henderson ("Hakeem"), and Dewaylyn Colvin were indicted for two counts of aggravated murder with firearms specifications for the shooting deaths of A.C. and R.H, which occurred days apart in November of 2011. The indictment further charged Appellant with the attempted

murder and felonious assault of D.J. with firearms specifications, for which he was acquitted, and three counts of having a weapon under disability, which were dismissed without objection by the state at a hearing on November 16, 2017.

{¶5} A superseding indictment, filed on May 16, 2013, added aggravated murder charges with firearms specifications against Appellant and Colvin for the shooting deaths of R.S. and K.M., which occurred in September of 2012. The superseding indictment also added a fourth weapon while under disability charge against Appellant, which was dismissed without objection by the state at the November 16th hearing.

{¶6} A second superseding indictment, filed on May 21, 2015 (captioned "superseding indictment"), added murder and drug charges against Hakeem, as well as various criminal charges, including aggravated murder, attempted murder, and aggravated arson, against three new defendants, Vincent Moorer, Melvin Johnson Jr., and Nahdia Baker. Relevant to the above-captioned appeal, the final count charged all of the defendants, including Appellant, with engaging in a pattern of corrupt activity. The trials of Colvin, Moorer and Johnson Jr., and Baker were ultimately severed, and Appellant and Hakeem were jointly tried.

## FACTS

{¶7} The jury trial began on April 25, 2016. Testimony offered by the state established the framework of a drug distribution network run by Colvin and Moorer. The members of the organization were divided in two groups based on their allegiance to either Colvin or Moorer. Colvin and Moorer kept the two factions separate for fear that subordinate members of the organization would collaborate and overtake the business. As a consequence, the two groups functioned separately from each other but as equal parts of the drug distribution network. Drug crimes committed by the organization were the subject of a series of indictments from 2011 to 2015, which resulted in the pleas and convictions of several of its members, including Colvin and two individuals who testified at Appellant's trial.

{¶8} M.P., who pled to and was convicted of drug charges in 2015 approximated the organization's monthly revenue to be a "couple hundred thousands." (Tr. 1297). Witnesses characterized Appellant, Hakeem, Johnson Jr., and R.H. as enforcers, hitters, or shooters for the organization.

{¶9} The following evidence was offered by the state to establish Appellant's role in the shooting deaths of A.C. and R.H. S.M., a resident of Victory Estates, a housing project on the east side of Youngstown, Ohio testified that she, her cousin B.A., and A.C. were present at her apartment on Woodcrest Avenue on November 12, 2011. S.M. conceded that she and A.C. were "high as f*ck" as a result of copious illegal drug use that evening, and that they were engaged in a clandestine romance.

{¶10} R.H., who is also S.M.'s cousin, called her multiple times to ask who was present at her apartment that evening, but she did not divulge that A.C. was there. When R.H. arrived, uninvited and unannounced, he and S.M. bickered for a short time. R.H. and A.C. then began "fumbling" with R.H.'s gun in the kitchen until A.C. cleared a jam. Around that time, A.C., who was drug sick, became physically ill and exited the apartment through the back door to vomit in the yard.

{¶11} According to S.M.'s testimony, roughly five minutes after A.C. left the apartment, S.M. heard gunshots. She testified that, ten to twenty minutes later, after she recovered from the initial shock and overcame her fear, she went to the back door. R.H. prevented her from exiting the apartment because he feared for her safety. From the rear window, S.M. saw A.C. lying on the ground between the patio and the sidewalk. He was holding his chest. S.M. turned from the back door and called 9-1-1, then handed the phone to B.A. to provide the relevant information to emergency services.

{¶12} When S.M. returned to the back door, R.H. had released the door handle and was in a neighboring yard. S.M. approached A.C., who was bleeding from bullet wounds to his face, elbow, and shoulder. S.M. asked A.C., "please tell me my cousin didn't do this." (Tr. 579). According to her testimony, A.C. "[shook] his head no." (Tr. 580.) S.M. specifically asked A.C. who shot him, and he answered, "Mike." Because A.C.'s mouth was filled with blood and he was struggling to breathe, S.M. told him to wait until the police arrived to describe the attack.

Case No. 16 MA 0068

{¶13} S.M. went back into the apartment to confirm that the police were en route. When she returned to A.C., R.H. was gone, but a group of onlookers had gathered at the crime scene.

{¶14} When S.M. was questioned by police that evening, she omitted A.C.'s identification of "Mike" as the gunman from her statement. S.M. first mentioned the identification to law enforcement in a videotaped interview that was conducted a few months before the trial. However, W.B., a bystander at the scene, identified S.M. as the individual that could be heard in the background of the 9-1-1 recording yelling that Appellant was the gunman.

{¶15} W.B. further testified that she noticed Appellant at the housing project earlier that same day with two others. All three were wearing black clothing and hoodies on a warm day. Later that evening, W.B. saw Appellant and another person lurking around S.M.'s apartment. W.B. believed Appellant was armed due to a bulge in his jacket.

{¶16} Just prior to the shooting, C.B., A.C.'s aunt, called 9-1-1 because she saw two young men wearing black clothing with hoods walking through Victory Estates with guns. After a police car circled the housing project and departed, C.B. called 9-1-1 a second time to report that she saw the men again, one walking up the back of Woodcrest Avenue and the other walking up the front. Then she heard gunshots.

{¶17} A.C. died before the police arrived. Four bullets were recovered from his body. A few days later, R.H.'s body was found at an intersection on the east side of Youngstown. He had been shot 18 times.

{¶18} R.E., an inmate at Northeast Ohio Correctional Center, testified that Appellant began confiding in him because of R.E.'s paralegal background, when they were both housed at the county jail. R.E. testified that Appellant admitted to fatally shooting A.C., explaining that R.H. lured A.C. out of the apartment and Hakeem drove the getaway car. Appellant further admitted that he killed R.H. because R.H. was disclosing information about the A.C. murder. Appellant said that Hakeem drove the car, with Colvin in the front seat, and Appellant in the backseat next to R.H. Appellant told R.E. that he fatally shot R.H. then kicked his body from the vehicle.

{¶19} During the trial, A.H., a key state's witness and a member of the organization, refused to appear due to fear of reprisal by the defendants. A.H. had entered a plea and was convicted in the 2011 drug indictment; however, his plea agreement did not contain a provision regarding cooperation with the state.

{¶20} A hearing was conducted to determine whether A.H.'s statements could be used at trial under the forfeiture by wrongdoing exception to the prohibition on hearsay. The trial court overruled objections by the defense, allowing the admission of A.H.'s February 26, 2013 videotaped statement to the police, and the testimony of a detective regarding his transcribed follow-up interview with A.H. on February 4, 2015.

{¶21} In his recorded statement, A.H. explained that he was at his residence with his brother, J.M., on the night that A.C. was fatally shot. J.M. was the victim of the attempted murder and felonious assault convictions of Moorer and Johnson Jr. in a separate trial. Appellant, Colvin, Hakeem, and R.H. stopped at the A.H.'s residence that evening to ask A.H. and J.M. for masks.

{¶22} Appellant and R.H. explained that they were going to Victory Estates to "take care of . . . whatever [member of A.C.'s family] they could find", as the word on the street was that a member of A.C.'s family was planning to rob Colvin. During his transcribed follow-up interview, A.H. stated that Colvin articulated the plan, and Appellant, Hakeem, and R.H. expressed agreement with its execution. The four men left in an automobile with Hakeem behind the wheel. A.H. testified that they were dressed in black, with the exception of Hakeem, who wore a black shirt and blue jeans.

{¶23} Appellant, Colvin, and Hakeem returned to A.H.'s residence an hour or two later without R.H. Appellant announced that he had shot a member of A.C.'s family, but did not know which one, because they looked alike. They told A.H. that there had been a $10,000 price set for the hit, so they went over and "served [the] dudes" and "put some work in." (DVD Tr. 24-25; Tr. 1128). Because J.M.'s girlfriend, S.J. was staying with his mother, A.H. and J.M. took Appellant and Hakeem to S.J.'s apartment in Boardman, Ohio to evade law enforcement.

{¶24} A.H. further explained that Colvin, Appellant, and Hakeem planned R.H.'s murder because he was divulging information about the A.C. murder. On the day R.H.

was murdered, A.H. saw R.H. in a vehicle, which was being driven by Hakeem, with Colvin and Appellant.

{¶25} According to A.H.'s statement, Appellant, while under the influence of MDMA, described to A.H. the circumstances surrounding both murders. R.H. entered the apartment in order to lure A.C. into the back yard, and Appellant shot A.C. while he was vomiting. Appellant was troubled by the expression on A.C.'s face after he had been shot. According to Appellant, during the automobile trip that would end in R.H.'s murder, R.H. kept telling Appellant that he loved him, as if R.H. knew that he was going to be killed. Appellant also expressed anger that he was never compensated for the A.C. murder.

{¶26} Appellant's role in the R.S. and K.M. murders was established at trial by the testimony of F.P., a member of the organization who testified pursuant to a plea agreement in a drug indictment, which required cooperation with the state. F.P. testified that he had known Colvin for a number of years because F.P. had sold drugs for the organization. F.P. also knew Appellant and identified him in the courtroom. F.P. testified that Colvin referred to Appellant as "Nephew." F.P. learned of the R.S. and K.M. murders while he was in the county jail in 2012.

{¶27} After F.P. was released, Colvin offered him the opportunity to resume selling drugs. At that time, Colvin told F.P. about the R.S. and K.M. murders. F.P. testified that Colvin's goal in admitting to the murders was to "put fear in [F.P.]. * * * to put fear in people." (Tr. 1198.)

{¶28} Colvin stated that "Nephew" murdered R.S. and K.M. Colvin explained that R.S. was murdered because he disrespected Moorer's girlfriend, T.E. when he assaulted her at a bar. Colvin conceded that K.M., who was in R.S.'s car when he was ambushed, was an innocent bystander. Appellant also admitted to F.P. that he killed R.S. and K.M.

{¶29} F.P.'s testimony regarding the R.S. and K.M. murders was corroborated by M.P. M.P. testified that Appellant and Moorer discussed the R.S. and K.M. murders with M.P. at T.E.'s house. According to M.P., R.S. and K.M. were murdered because R.S. had assaulted T.E. at a bar and "the team gonna look bad if they didn't [retaliate]."

(Tr. 1306.) Moorer said "[t]hey put Mike on it," and Appellant added that "he had to put [R.S.] down." (Tr. 1306-1307.)

{¶30} M.P. further testified that Appellant and Hakeem complained that they never received payment for the murders. Appellant said they were supposed to "come in, pull [their] moves and get paid and go back and leave town." (Tr. 1301-1311).

{¶31} Joseph Ohr, M.D., Mahoning County Forensic Pathologist and Deputy Coroner, performed autopsies on A.C., R.H., R.S., and K.M. Dr. Ohr testified that A.C. would have died within two to three minutes of sustaining the gunshot wound that entered his chest then severed his carotid artery and jugular vein. R.H. suffered 31 separate entrance and exit wounds. Dr. Ohr testified that R.S. was shot six times and sustained nine bullet wounds. K.M. sustained three gunshot wounds and died as a result of gunshot wounds to her head.

## ANALYSIS

{¶32} In this appeal, Appellant advances seven assignments of error:

### ASSIGNMENT OF ERROR NO. 1:

**THE TRIAL COURT ERRED BY PERMITTING THE STATE TO PLAY OVER OBJECTION AN UNSWORN VIDEO INTERVIEW WITH [A.H.]. T.P. 874-1016, 1116-32; STATE'S EXHIBITS 377 AND 378; SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

{¶33} There is no dispute A.H.'s statements to the police were testimonial. If a hearsay statement being considered for admission is testimonial, it is subject to the confrontation clause. *Crawford v. Washington*, 541 U.S. 36, 61-62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, the Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. *Reynolds v. United States*, 98 U.S. 145, 159, 25 L.Ed. 244 (1879). The rule of forfeiture by wrongdoing extinguishes confrontation claims on equitable grounds. *Crawford*, 541 U.S. 36, at 62.

Case No. 16 MA 0068

**{¶34}** Accordingly, even when the right to confrontation applies, testimonial hearsay can be admitted under the common law forfeiture by wrongdoing exception. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 108, citing *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). The doctrine is applicable when the defendant has engaged in intentional conduct designed to prevent the witness from testifying. *Id.* Defendants forfeit the right to confrontation when they seek to undermine the judicial process by procuring or coercing silence from witnesses. *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**{¶35}** Pursuant to Evid.R. 804(B)(6), the forfeiture by wrongdoing hearsay exception permits the admission of "[a] statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." The wrongdoing need not consist of a criminal act. 2001 Staff Note to Evid.R. 804(B)(6) ("Encouraging a witness to leave the state is wrongdoing in this context because no person has the legal right to refuse to provide testimony in the absence of a privilege or other rule of evidence."), *see also Giles*, 554 U.S. at 374 (the common law forfeiture rule had a purpose of "removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them" and coincided with the court's power to protect the integrity of its proceedings).

**{¶36}** In applying the forfeiture by wrongdoing exception, the state must demonstrate by a preponderance of the evidence that the defendant's wrongdoing resulted in the witness's unavailability, and at least one purpose was to cause the witness to be unavailable at trial. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 84, 87, 90. The state need only show the defendant's wrongdoing, which caused the witness's unavailability, was motivated in part by a desire to silence the witness. *Id.* at ¶ 84, 90 (a defendant can have various purposes, and the state need not show the defendant's sole motivation was to eliminate the victim as a potential witness). In making the admissibility decision, a court is not bound by the rules of evidence. Evid.R. 104(A). Although evidentiary decisions on hearsay are typically reviewed for an abuse of discretion, we review de novo evidentiary rulings that implicate

the Confrontation Clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508 (2016), ¶ 97.

**{¶37}** During the admissibility hearing, testimony was provided by A.H.'s parole officer, one of the prosecutors assigned to the case, and three police officers. Texts from A.H. to another prosecutor, who was present at the last meeting with the witness, were also offered. The trial court was asked to take judicial notice of issues with other witnesses who had been threatened, as well as the trial court's decisions to authorize the filing of "counsel only" pleadings and to seal various parts of the record prior to trial. The trial court concluded A.H. was unavailable because the defendants or their functionaries engaged in wrongdoing that resulted in A.H.'s unavailability. The trial court further found that the defendants' purpose was to cause A.H. to be unavailable for trial.

**{¶38}** Appellant argues that the forfeiture by wrongdoing exception applies solely when the defendant intended to and did prevent the witness from testifying. He argues that the state failed to prove by a preponderance of the evidence that he engaged in the threats that caused A.H.'s unavailability, or that he acted with the purpose to cause this unavailability.

**{¶39}** We previously rejected the identical argument raised by Hakeem in *State v. Henderson*, 7th Dist. No. 16 MA 0057, 2018-Ohio-5124. We first observed that circumstantial evidence possesses the same probative value as direct evidence, *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001), and rational inferences are permissible and evaluated in the state's favor in ascertaining the sufficiency of the evidence. *See, e.g.*, *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). Considering the evidence presented by the state at the admissibility hearing, combined with the rational inferences taken in the state's favor, we opined that there was sufficient evidence that Hakeem participated in procuring A.H.'s absence, with the intent to do so, and that the preponderance of evidence supported the decision of the trial court. *Henderson* , supra, ¶ 32; *see also State v. Henderson*, 7th Dist. No. 16 MA 0057, 2019-Ohio-130 (denying motion for reconsideration based on forfeiture by wrongdoing).

**{¶40}** Appellant's counsel conceded at oral argument that there are no facts in the record that distinguish Henderson's confrontation clause claim from the one

Case No. 16 MA 0068

asserted here. Because we rejected the identical argument based on the identical evidence in our prior decision, we find that Appellant has failed to demonstrate any error and his first assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 2:

**THE TRIAL COURT ERRED BY PERMITTING [S.M.] TO TESTIFY THAT [A.C.], IN RESPONSE TO HER LEADING QUESTIONS, SAID THAT THE PERSON WHO SHOT HIM WAS "MIKE." EVID.R. 803(2); T.P. 580, 590, 772-3, 1142**.

**{¶41}** Hearsay is generally not admissible. Evid.R. 802. Because A.C.'s identification of "Mike" as the gunman was an out-of-court statement offered to prove its truth, the trial court admitted the statement pursuant to the "excited utterance" exception to the general rule against hearsay.

**{¶42}** Evid.R. 803(2), captioned "Excited Utterance," reads, in its entirety, "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." A four-part test is applied to determine the admissibility of a statement as an excited utterance:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

Case No. 16 MA 0068

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus.

**{¶43}** The fact that a statement is made in response to a question does not preclude it from being characterized as an excited utterance. *State v. Collins*, 7th Dist. No. 10 CO 10, 2011-Ohio-6365, ¶ 78, citing *State v. Wallace*, 37 Ohio St.3d 87, 524 N.E.2d 466 (1988). The admission of a declaration as an excited utterance is not precluded by questioning that: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties. *Id.,* citing *Wallace* at 93.

**{¶44}** Appellant argues that A.C.'s statement was influenced by his desire to spare his lover's feelings regarding her cousin's involvement in the shooting. Appellant further asserts the lack of trustworthiness of out-of-court statements at the heart of the hearsay prohibition is of particular concern here, because S.M. withheld A.C.'s identification of "Mike" as his assailant from law enforcement for over four years. (Tr. 590).

**{¶45}** "The trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception." *State v. Dever*, 64 Ohio St.3d 401, 410, 1992-Ohio-41, 596 N.E.2d 436. An appellate court will not reverse a trial court's decision to admit or exclude certain evidence, absent an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 92. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶46}** Considering the context of S.M.'s testimony regarding A.C.'s identification of "Mike" as his assailant, we find that the trial court did not abuse its discretion when it admitted A.C.'s statement. S.M.'s question was neither coercive nor leading, it facilitated the expression of the natural focus of A.C.'s thoughts – his assailant, and it did not destroy the domination of his nervous excitement as a result of being shot four times.

**{¶47}** It is reasonable to conclude that A.C., having been shot in the face, elbow, and shoulder, bleeding from the mouth, and struggling to speak, was unlikely to have been motivated to lie in order to preserve S.M.'s relationship with her cousin. S.M. testified that she lied to R.H. about A.C.'s presence in the apartment that evening and that she and R.H. bickered when he appeared without notice or invitation. Furthermore, although S.M. did not inform police at the scene that A.C. had identified "Mike" as his assailant, W.B. identified S.M.'s voice on the 9-1-1 recording yelling that Appellant was the gunman.

**{¶48}** Because the record supports the conclusion that A.C.'s statement was an unreflective and sincere expression of his actual impressions and beliefs in the aftermath of being shot in the face, neck, and shoulder, and S.M.'s question had no impact of A.C.'s identification of "Mike" as the gunman, we find that Appellant's second assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 3:

**THE TRIAL COURT ERRED BY PERMITTING A DETECTIVE TO TESTIFY, OVER OBJECTION, THAT UNNAMED WITNESSES HAD BEEN SAYING THAT MICHAEL AUSTIN WAS ASSOCIATED WITH THE DEATH OF A.C.. EVID.R. 403(A), 801(C), AND 802; T.P. 1105-6.**

**{¶49}** Detective Sergeant Patrick Kelly, the lead investigator of the A.C. murder, testified that "[law enforcement] started hearing the name [R.H.] and Mike Austin early on." (Tr. 1105). An objection by Appellant's counsel was overruled. Kelly continued, "We started hearing the name of [R.H.] and Mike Austin early on in the investigation in possibly being involved in A.C." (Tr. 1105-1106).

Case No. 16 MA 0068

{¶50} Appellant contends that the out-of-court statements constitute hearsay for which no exception applies.  The state argues that the testimony was offered to explain Kelly's subsequent investigative activities, rather than to prove the truth of the matter asserted.

{¶51} Kelly provided the following summary of the A.C. murder investigation: Kelly attempted to interview S.M. and B.A. in the two days following A.C.'s murder but could not locate them.  Around that time, he interviewed L.C. and P.H., who arrived at Victory Estates shortly after A.C. was shot.  A meeting of various local law enforcement agencies, including members of the Mahoning County Law Enforcement Task Force, was organized by the Chief of Police following the R.H. murder.  The goal of the meeting was to create a coalition of state and federal agents that would share information and informants to collect evidence connecting members of the drug organization with the murders.  At the meeting, Kelly learned from Officer Robert Patton, a member of the task force and the lead investigator in the then-ongoing narcotics investigation of the Moorer/Colvin organization, that A.H., who was about to be indicted for drug crimes, may have information about the homicides.

{¶52} It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed. *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401, 408 (1980).  Based on Kelly's testimony, we find that the trial court did not abuse its discretion when it admitted the unsupported observations of unidentified out-of-court declarants.  The word on the street was not offered for the truth of the matter asserted, but, instead, to provide a road map of Kelly's investigation and explain his interest in A.H.'s information about the homicides.  Insofar as the information was not offered as evidence of Appellant's guilt, we find that Appellant's third assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 4:

**THE TRIAL COURT ERRED BY REFUSING TO PERMIT MICHAEL AUSTIN TO CROSS-EXAMINE A POLICE OFFICER ABOUT THE OFFICER'S ASSERTION THAT A KEY STATE WITNESS HAD NOT**

**ACTED ILLEGALLY. EVID.R. 611; FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; T.P. 484, 499, 508, 555-6.**

{¶53} Patton summarized all of the convictions that resulted from the drug indictments in his direct testimony. The narcotics investigation was ongoing when he and other members of the task force were invited to attend the meeting organized by the Chief of Police following the A.C. and R.H. homicides. Colvin entered a guilty plea and was convicted of trafficking in drugs and possession of drugs, felonies of the second degree, with a forfeiture specification, having while weapons under disability, and engaging in a pattern of corrupt activity. A.H. entered a guilty plea and was convicted of two counts of trafficking in drugs, felonies of the second degree, as well as engaging in a pattern of corrupt activity. Moorer, Johnson Jr. and several other members of the organization not relevant to the current appeal were prosecuted in federal court.

{¶54} On cross-examination, Patton conceded that A.H. continued to sell drugs while he was out on bond for the 2011 drug indictment. Patton testified that a confidential informant purchased drugs from A.H., and the controlled buy served as probable cause for a search of the house where A.H. was residing. The search produced guns, drugs, and drug paraphernalia.

{¶55} Although A.H. was present during the execution of the search warrant, Patton testified that the search did not produce evidence sufficient to support criminal charges against A.H. A.H. gave a statement regarding the A.C. and R.H. homicides at that time. Patton conceded that any conviction based on the search of the home would have resulted in additional jail time, over and above the agreed sentence for the 2011 drug indictment.

{¶56} On redirect, Patton testified that A.H. entered into a plea agreement that included a recommended sentence of three years. Patton further testified that there was insufficient evidence based on the warrant to charge A.H. with any crimes, and, as a consequence, he was not charged by the state or federal government following the search, which occurred in February of 2013. According to Patton's testimony, A.H.

agreed to cooperate with the State at that time, and provided a video-taped statement on February 26, 2013. Patton did not mention the controlled buy on redirect.

**{¶57}** On recross, Appellant's counsel asked, "Did you do a report, an investigative report about that particular buy?" A side bar requested by the state was held off the record, and cross-examination resumed without any response to the then-pending question about the investigative report. Patton reiterated that A.H. had not engaged in any chargeable criminal conduct. Patton further testified that A.H. faced a maximum of 26 years and a maximum fine of $50,000 for the conduct charged in the 2011 indictment.

**{¶58}** On further redirect, Patton testified that A.H.'s plea agreement in the 2011 drug case was not predicated upon his cooperation or truthful testimony in this case. Patton testified that the plea agreement of another individual that was convicted in the 2011 drug case, and was subpoenaed to provide testimony, contained a specific provision about cooperation and truthful testimony, but A.H.'s plea agreement did not.

**{¶59}** The following day, Appellant's counsel made the following proffer:

I'd like to proffer at this time argument against the sustained objection by Marty Desmond regarding exceeding the scope of redirect. This was regarding a witness, Detective Robert Patton. It occurred on February 26, 2016. The questions were regarding his investigative report dated February 20th, 2013 wherein he discussed chargeable criminal activity as a result of a controlled buy regarding A.H. and a subsequent warrant and raid of the house where A.H. was staying.

There's [sic] two issues we'd like to raise. The judge sustained the objection indicating that the prosecutor did not mention the controlled buy on redirect. Therefore, any questions made by me regarding the controlled buy exceeded the scope.

(Tr. 554-555).

**{¶60}** Citing *State v. Treesh*, supra, defense counsel argued that Ohio does not parrot the federal rule with respect to the scope of cross-examination, and cross-

examination is not limited to the subject matter of direct examination. Compare Evid.R. 611(B) with Fed.R.Evid. 611(b). It is available for all matters pertinent to the case that the party calling the witness would have been entitled or required to raise. *Id.* at 481; citing *Smith v. State*, 125 Ohio St. 137, 180 N.E. 695 (1932), paragraph one of the syllabus. Therefore, trial counsel argued that he should have been able to cross-examine Patton on the investigative report. The investigative report was not admitted into evidence as part of the proffer.

{¶61} The right to cross-examine witnesses is guaranteed to a defendant, but recross-examination is only required when the state enquires into new matters on redirect. *State v. Faulkner*, 56 Ohio St.2d 42, 46, 381 N.E.2d 934 (1978), citing *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). "Because redirect examination is limited to new matters raised on cross-examination, '[i]deally, no new material should be presented on redirect, because litigants will in theory have presented all pertinent issues during the direct examination * * * it stands to reason that no new matters should arise on redirect examination.' " *State v. Hartley*, 8th Dist. No. 81706, 2003-Ohio-3946, ¶ 14, quoting *United States v. Riggi*, 951 F.3d 1368, 1375 (3d Cir.1991).

{¶62} When new matters arise on redirect examination, the trial court must allow the defense the opportunity to recross-examine. *Faulkner* at 46. Where the evidence is new, the right to cross-examination would necessarily attach, because cross-examination would be the only means by which the accused could test the reliability of the evidence." *Hartley*, supra, citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The Eighth District has observed that "while the abuse of discretion standard necessarily suggests that there can be no hard and fast rules on what constitutes new material for purposes of recross-examination, * * * the [trial] court should seek to limit recross-examination to testimony on redirect examination which raises a new subject-matter that is both material and non-redundant in context." *State v. Hartley*, 8th Dist. No. 81706, 2003-Ohio-3946, ¶ 20.

{¶63} Trial counsel had the opportunity to ask Patton about the investigative report on cross-examination but failed to do so. The state did not elicit any new testimony regarding the controlled buy on redirect. As a consequence, we find that the

trial court did not abuse its discretion when it did not allow defense court to recross-examine Patton regarding the controlled buy, and, therefore, Appellant's fourth assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 5:

**CUMULATIVE ERROR PREJUDICED MICHAEL AUSTIN. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, EVID.R. 403(A), 611, 801(C), 802, 803(2).**

**{¶64}** Cumulative error exists only where the harmless errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. There is no such thing "as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508–509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). To support a claim of cumulative error, there must be multiple instances of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). When an appellate court finds no error, the doctrine does not apply. *State v. Lyons*, 7th Dist. No. 16-JE-0008, 2017-Ohio-4385, ¶ 46. Because we have not found any error, we find that Appellant's fifth assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 6:

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY SENTENCING MICHAEL AUSTIN TO LIFE WITHOUT PAROLE. EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; R.C. 2953.08; APX. A-1; T.P. 1-26 (SENTENCING).**

**{¶65}** Appellant contends that R.C 2953.08(D)(3), which prohibits appellate review of sentences imposed for murder and aggravated murder, violates the Eighth and Fourteenth Amendments. The statutory right to appellate review of a criminal sentence is provided in R.C. 2953.08, which, according to the Ohio Supreme Court,

"specifically and comprehensively defines the parameters and standards – including the standard of review – for felony-sentencing appeals." *State v. Marcum*, 146 Ohio St.3d 516, 59 N.E.3d 1231, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21.

{¶66} R.C. 2953.08(D)(3) reads, in its entirety, "[a] sentence imposed for aggravated murder or murder pursuant to section 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." In *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690 (2005), the Ohio Supreme Court recognized that R.C. 2953.08(D)(3) is unambiguous. The Court opined that the statute, "clearly means what it says: such a sentence cannot be reviewed." *Id.* at ¶ 17.

{¶67} Legislative enactments are to be afforded a strong presumption of constitutionality. *State v. McDonald*, 31 Ohio St.3d 47, 48, 509 N.E.2d 57, 59 (1987). Any reasonable doubt regarding the constitutionality of a statute must be resolved in favor of the legislature's power to enact the law. *Id.* Thus, legislation will not be struck down unless the challenger establishes that it is unconstitutional beyond a reasonable doubt. *State v. Weitbrecht*, 86 Ohio St.3d 368, 1999-Ohio-113, 715 N.E.2d 167 citing *State v. Thompkins*, 75 Ohio St.3d 558, 560, 664 N.E.2d 926, 928 (1996).

{¶68} R.C. 2953.08(D)(3) has survived constitutional challenges predicated upon the Equal Protection Clause of the Unites States Constitution in *State v. Burke*, 2016-Ohio-8185, 69 N.E.3d 774 (2d Dist.), *State v. Wilson*, 4th Dist. No. 16CA12, 2018-Ohio-2700 and State *v. Weaver*, 5th Dist. No. CT2016-0033, 2017-Ohio-4374, 93 N.E.3d 178, ¶ 20, appeal not allowed, 151 Ohio St.3d 1510, 2018-Ohio-365, 90 N.E.3d 950, ¶ 20 (2018). Both the Second and Fourth Districts concluded that the severity of the crimes of murder and aggravated murder provide a rational basis for the separate statutory scheme, and recognized that "[t]he General Assembly's practice of treating sentencing for aggravated murder and murder convictions differently from other felonies is longstanding." *State v. Hollingsworth*, 143 Ohio App.3d 562, 569, 758 N.E.2d 713 (8th Dist. 2001).

{¶69} The Eighth Amendment to the United States Constitution applies to the states pursuant to the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments

inflicted." The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1. The constitutional right flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense. *Id.*

**{¶70}** Appellant cites no case law in support of his Eighth Amendment challenge. He relies exclusively on the statement relating to the denial of a writ of certiorari written by United States Supreme Court Justice Sotomayor in *Campbell v. Ohio*, -- U.S. --, 138 S.Ct. 1059, 2017 WL 4409905. Campbell challenged the constitutionality of R.C. 2953.08(D)(3) for the first time before the Ohio Supreme Court, and argued that the statute violated the Due Process and Equal Protection Clauses of the Unites States Constitution. Certiorari was denied by both the state and federal high courts based on Campbell's failure to adequately and sufficiently present his constitutional argument to the state intermediate court.

**{¶71}** Nonetheless, Justice Sotomayor observed that "[t]rial judges making the determination whether a defendant should be condemned to die in prison have a grave responsibility, and the fact that Ohio has set up a scheme under which those determinations 'cannot be reviewed' is deeply concerning." *Id.* at 1060, quoting R.C. 2953.08(D)(3). Recognizing that life without parole "is the second most severe penalty permitted by law," *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)(Kennedy, J., concurring in part and concurring in judgment), Justice Sotomayor criticized R.C. 2953.08(D)(3) because "a life-without-parole sentence [in Ohio], no matter how arbitrarily or irrationally imposed, is shielded from meaningful review." *Campbell* at 1060.

**{¶72}** Justice Sotomayor observed that the correspondence between capital punishment and life sentences might similarly require reconsideration of other sentencing practices in the life-without-parole context. She observed that Eighth Amendment jurisprudence developed in the capital context calls into question whether a defendant should be condemned to die in prison "without an appellate court having passed on whether that determination properly took account of his circumstances, was imposed as a result of bias, or was otherwise imposed in a 'freakish manner.' " *Id.*

{¶73} However, in 1991, in Part IV of *Harmelin*, supra, a plurality of the United States Supreme Court concluded that a mandatory sentence of life without parole, without consideration of mitigating factors, does not violate the Eighth Amendment. Harmelin asked the Court to create an "individualized mandatory life in prison without parole sentencing doctrine" similar to the "individualized capital-sentencing doctrine." *Id.* at 995. The *Harmelin* plurality declined, reasoning that "there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Id.* The plurality cited Justice Stewart's concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), for the proposition that:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity."

*Harmelin* at 995-996, citing *Furman* at 306 (Stewart, J., concurring).

{¶74} The plurality in *Harmelin* further observed that a sentence of life without parole is unique in that it is the second most severe known to the law; but life imprisonment with the possibility of parole is also unique in that it is the third most severe. And if the petitioner's sentence foreclosed some "flexible techniques" for later reducing his sentence, it did not foreclose all of them, since there remained the possibilities of retroactive legislative reduction and executive clemency. *Id.* at 996. Finally, the plurality recognized that there would be negligible difference between life without parole and other sentences of imprisonment – for example, a life sentence with eligibility for parole after 20 years, or even a lengthy term sentence without eligibility for parole, given to a 65-year-old man. The *Harmelin* plurality opined that, even where the difference is the greatest, a sentence of life without parole cannot be compared with death. *Id.*

**{¶75}** Although not directly on point, the reasoning of the plurality in *Harmelin* is directly at odds with Justice Sotomayor's observation that life-without-parole sentences, because of their likeness to death sentences, must be afforded meaningful appellate review. Although the United States Supreme Court, post-*Harmelin*, has carved out an Eighth Amendment exception for mandatory life-without-parole sentences for juvenile offenders, the exception is closely circumscribed to individuals that committed their crimes prior to the age of 18. Further, although R.C. 2953.08(D)(3) forecloses appellate review of Appellant's murder and aggravated murder sentences, the sentencing court was nonetheless obligated to consider the goals of sentencing and the aggravating and mitigating factors set forth in R.C. 2929.11 and 2929.12 prior to imposing sentence.

**{¶76}** The United States Supreme Court has yet to consider the constitutionality of a statute that forecloses appellate review of a sentence of life without parole. In rejecting the argument that mandatory life-without-parole sentences for adults should be afforded the same individualized sentencing as capital sentences, a plurality of the Court recognized that a sentence of life without parole is not tantamount to a death sentence. As a consequence, we conclude that Appellant has failed to demonstrate beyond a reasonable doubt that R.C. 2953.08(D)(3) violates the Eighth Amendment.

**{¶77}** In *State v. Weitbrecht*, 86 Ohio St.3d 368, 715 N.E.2d 167 (1999), the Ohio Supreme Court applied Justice Kennedy's Eighth Amendment analysis in his concurring opinion in *Harmelin* at 997, 111 S.Ct. 2680, 115 L.Ed.2d 836, citing with approval his conclusion that " '[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " *Weitbrecht*, 86 Ohio St.3d at 373, 715 N.E.2d 167, quoting *Harmelin*, 501 U.S. at 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (Kennedy, J., concurring in part and in judgment). The Ohio Supreme Court further emphasized that " 'only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality' " may a court compare the punishment under review to punishments imposed in Ohio or in other jurisdictions. *Id.* at 373, 715 N.E.2d 167, fn. 4, quoting *Harmelin*, 501 U.S. at 1005.

{¶78} Even assuming arguendo that R.C. 2953.08(D)(3) is unconstitutional, we find that Appellant's sentences are neither grossly disproportionate to his crimes nor clearly and convincingly contrary to law. Appellant argues that he was between the ages of eighteen and nineteen when he committed his crimes, and the United States Supreme Court has held that "young people are 'less culpable' than older ones, and also that they have a particularly high chance of rehabilitation." (Appellant's Brf., p. 26). Appellant contends that even though he was over the age of eighteen, he was still a "young person," and the trial court should have considered his age when imposing its sentence, citing *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) and *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

{¶79} In *Roper,* supra, the United States Supreme Court held that the Eighth Amendment bars capital punishment for individuals under the age of 18. The *Roper* Court recognized that children are constitutionally different from adults for sentencing purposes. Their " 'lack of maturity' " and " 'underdeveloped sense of responsibility' " lead to recklessness, impulsivity, and heedless risk-taking. *Id.* at 569. They "are more vulnerable * * * to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Id.* And because a child's character is not as "well formed" as an adult's, his traits are "less fixed" and his actions are less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.* at 570.

{¶80} In *Graham*, supra, the defendant was sentenced to life imprisonment without the possibility of parole after being convicted of armed robbery, while he was on probation for crimes committed as a juvenile. The United States Supreme Court held that the Eighth Amendment prohibits imposition of a life sentence without parole for a juvenile offender who did not commit homicide, and that a state must give a juvenile non-homicide offender a meaningful opportunity to obtain release. *Id.,* paragraphs one and two of the syllabus.

{¶81} Two years later, in *Miller*, supra, the United States Supreme Court held that a sentencing scheme that mandated life in prison without the possibility of parole for juvenile homicide offenders violated the Eighth Amendment prohibition against cruel

and unusual punishment. *Id.*, syllabus. The defendants in that case were each convicted of capital murder committed when they were 14 years old.

**{¶82}** *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. However, in *Graham*, the United States Supreme Court recognized that "18 is the point where society draws the line for many purposes between childhood and adulthood * * *" *Graham* at 2016. Clearly, the United States Supreme Court has drawn the same line for the purpose of sentences of life without parole. Insofar as Appellant was over the age of eighteen when he committed his crimes, we find that *Graham* and *Miller* are inapposite.

**{¶83}** Even assuming that Appellant's age is a relevant consideration, his crimes were not the result of recklessness, impulsivity, or heedless risk-taking. Appellant murdered four people, coldly plotting the murder of three. A.C. died for no other reason than he was related to a man who was allegedly planning to rob Colvin. K.M. died because she unwittingly accompanied R.S. to an ambush. The testimony at trial establishes that Appellant is a merciless killer who premeditated murder for financial gain.

**{¶84}** Based on the United States Supreme Court's refusal to adopt an "individualized mandatory life in prison without parole sentencing doctrine," *Harmelin* at 994, we find Appellant has failed to prove beyond a reasonable doubt that R.C. 2953.08(C)(3) violates the Eighth Amendment. In the alternative, we find that Appellant's sentences for murder and aggravated murder are neither grossly disproportionate to his crimes nor clearly and convincingly contrary to law. As a consequence, Appellant's sixth assignment of error has no merit.

## ASSIGNMENT OF ERROR NO. 7:

**THE RECORD CLEARLY AND CONVINCINGLY DOES NOT SUPPORT THE TRIAL COURT'S FINDINGS IN SUPPORT OF CONSECUTIVE SENTENCES. R.C. 2953.08; APX. A-1, T.P.19 (SENTENCING).**

**{¶85}** Consecutive sentences in Ohio are imposed pursuant to R.C. 2929.14(C)(4), which provides:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

**{¶86}** Although the trial court is not required to recite the statute verbatim or utter "magic" or "talismanic" words, there must be an indication that the court found (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger posed to the public, and (3) one of the findings described in R.C. 2929.14(C)(4)(a), (b), or (c). *State v. Bellard*, 7th Dist. No. 12-MA-97, 2013-Ohio-2956, ¶ 17. The trial court need not give its reasons for

making those findings. *State v. Power*, 7th Dist. No. 12 CO 14, 2013-Ohio-4254, ¶ 38. A trial court must make the consecutive sentence findings at the sentencing hearing and must additionally incorporate the findings into the sentencing entry. *State v. Williams*, 7th Dist. No. 13-MA-125, 2015-Ohio-4100, ¶ 33-34, citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

**{¶87}** A defendant can challenge a consecutive sentence on appeal by one of two means: First, by contending the sentence is contrary to law because the trial court failed to make the necessary findings required by R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(b). Second, the defendant can argue the record does not support the findings made under R.C. 2929.14(C)(4). R.C. 2953.08(G)(2)(a). *State v. Collins*, 7th Dist. No. 15 NO 0429, 2017-Ohio-1264, ¶ 6.

**{¶88}** Appellant does not argue that the trial court failed to make the necessary statutory findings or that the record does not support the imposition of consecutive sentences. Instead, Appellant advances a theoretical argument that any sentence imposed to be served consecutively to a sentence of life without parole cannot fulfill the statutory requirements to protect and punish, insofar as any sentence in addition to life without parole can have no practical effect.

**{¶89}** In *Porterfield* supra, the Ohio Supreme Court acknowledged that appellate courts are statutorily prohibited from reviewing sentences for murder and aggravated murder. The *Porterfield* Court concluded nonetheless that appellate courts are not statutorily prohibited from reviewing the imposition of consecutive sentences that include a sentence or sentences for murder or aggravated murder convictions. *Porterfield* ¶ 19 ("While R.C. 2953.08(D) clearly precludes review of individual murder sentences imposed pursuant to R.C. 2929.02 to 2929.06, none of these sections authorize consecutive sentences.")

**{¶90}** We have previously held that a challenge to the imposition of determinate sentences for firearms specifications consecutive to a sentence of life without parole is moot. *State v. Herring*, 7th Dist. No. 00 JE 37, 2002-Ohio-2786, ¶ 34. A case or issue is moot when it becomes "academic"; that is, the court can issue no decision that will have any practical effect on the controversy. *State ex rel. Cincinnati Enquirer v. Hunter*,

141 Ohio St.3d 419, 24 N.E.3d 1170, 2014-Ohio-5457, 24 N.E.3d 1170, ¶ 4, quoting *In re L.W.*, 168 Ohio App.3d 613, 2006-Ohio-644, 861 N.E.2d 546, ¶ 11 (10th Dist.).

**{¶91}** The *Herring* panel predicated its conclusion on *State v. Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339 (1999), where the Ohio Supreme Court held that a challenge to the imposition of consecutive sentences is rendered moot by the imposition of the death sentence. *Id.* at 52; *see also State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 50; *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 142. In 1995, the Eleventh District Court of Appeals extended *Campbell* to determinate sentences imposed consecutively with a sentence of life imprisonment without parole, and concluded that a prison term served consecutively to the life term is moot. *State v. Davie*, 11th Dist. No. 92-T-4693 (Dec. 27, 1995). The Eight District has likewise recognized that "[a]lthough a prison term of life without the possibility of parole is not the same as a death sentence, the import is the same" as it relates to the imposition of consecutive sentences. *State v. Campbell*, 8th Dist. No. 103982, 2016-Ohio-7613, ¶ 8, *appeal not allowed*, 149 Ohio St.3d 1464, 2017-Ohio-5699, 77 N.E.3d 988 (2017), and *cert. denied*, 138 S.Ct. 1059, 200 L.Ed.2d 502 (2018).

**{¶92}** The Eighth District in *State v. Chavez*, 8th Dist. No. 99436, 2013-Ohio-4700, opined that "[i]mposing additional consecutive sentences to a life-without-parole sentence has a social goal of sending a message to offenders and the public that abhorrent behavior will be severely punished, but has no legal significance outside of academic rhetoric." *Id.* at ¶ 47. As Appellant correctly argues, the imposition of consecutive sentences has no practical effect. Accordingly, we find that any argument predicated upon the imposition of sentences consecutive to the imposition of a sentence of life without parole is moot.

**{¶93}** Despite the fact that the Ohio Supreme Court held that the challenge to the imposition of consecutive sentences was moot in *Campbell*, it still addressed the merits of the issue, and found no error. *Campbell*, 69 Ohio St.3d at 58, 630 N.E.2d 355. We reach the same conclusion here.

**{¶94}** After imposing the specific sentences for each crime, the trial court stated:

This court additionally finds that consecutive prison terms are necessary to protect the public, to punish you, that they are not disproportionate and

Case No. 16 MA 0068

find that the harm was so great that a single term does not adequately reflect the seriousness of your conduct and that consecutive terms are needed to protect the public, and I am, therefore, ordering that Counts 1, 4, 10, 11 and 29 be served consecutively to each other.

(7/27/16 Sent. Tr., 18-19).

{¶95} The trial court made the required statutory findings and the imposition of consecutive sentences is supported by the record. The murders were committed in cold blood and for pecuniary gain. There is no question that consecutive sentences serve the dual purpose of punishing Appellant and protecting the public by making certain that he will never be released from prison. Further, the consecutive sentences are not disproportionate to Appellant's crimes, as a single term of imprisonment would not adequately reflect the seriousness of his conduct.

{¶96} In summary, we find that Appellant's argument based on the lack of practical effect of sentences imposed consecutive to a sentence of life without parole is moot. In the alternative, we find that the trial court made the required statutory findings, and the imposition of consecutive sentences is supported by the record and not contrary to law. Therefore, Appellant's seventh assignment of error has no merit.

## CONCLUSION

{¶97} Appellant has failed to show that the trial court abused its discretion with respect to the admission of the evidence at issue in this appeal. Appellant has likewise failed to show that R.C 2953.08(D)(3) is unconstitutional beyond a reasonable doubt. Further, Appellant's sentence is neither contrary to law nor grossly disproportionate to his crimes, and, therefore, does not violate the constitutional prohibition on cruel and unusual punishment. Finally, Appellant's challenge to the imposition of consecutive sentences to his life-without-parole sentence is moot, or, in the alternative, his sentences are not contrary to law. For the foregoing reasons, Appellant's conviction and sentence are affirmed.

Donofrio, J., concurs.
Robb, J., concurs.

Case No. 16 MA 0068

―――――――――――――

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**