[Cite as *State v. Ellison*, 2024-Ohio-653.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

KYLE ELLISON,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 MA 0019**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2021 CR 703B

**BEFORE:**
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment,
Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor*,* and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Rhys B. Cartwright-Jones*, for Defendant-Appellant.

Dated: February 21, 2024

**KLATT, J.**

{¶1} Appellant, Kyle Ellison, appeals from the February 6, 2023 judgment of the Mahoning County Court of Common Pleas. Following a trial by jury, Appellant was found guilty of kidnapping, abduction, robbery, and assault. The trial court sentenced him to five years (minimum) to seven and one-half years (maximum) in prison.[1] On appeal, Appellant raises arguments involving sufficiency of the evidence, manifest weight, cumulative error doctrine, and actual vindictiveness in sentencing on the part of the trial court. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} On November 18, 2021, Appellant and his co-defendants, Undrel Fletcher ("Fletcher"), Keith Ellison ("Keith"), and Anthony Ellison ("Anthony"), were indicted by the Mahoning County Grand Jury on eight counts:[2] count one (all defendants), kidnapping, a felony of the first degree in violation of R.C. 2905.01(A)(1), (2), (3) and (C)(1), with a firearm specification; count two (all defendants), abduction, a felony of the third degree in violation of R.C. 2905.02(A)(1), (2) and (C), with a firearm specification; count three (all defendants), aggravated robbery, a felony of the first degree in violation of R.C. 2911.01(A)(3) and (C), with a firearm specification; count four (all defendants), robbery, a felony of the second degree in violation of R.C. 2911.02(A)(2) and (B), with a firearm specification; count five (all defendants), felonious assault, a felony of the second degree in violation of R.C. 2903.11(A) and (D)(1)(a), with a firearm specification; count six (all defendants), assault, a misdemeanor of the first degree in violation of R.C. 2903.13(A) and (C); count seven (Appellant only), having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2) and (B); and count eight (Anthony only), having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2) and (B). Appellant retained counsel, pled not guilty at his arraignment, and waived his right to a speedy trial.

---

[1] Am. Sub. S.B. No. 201, 2018 Ohio Laws 157, known as the "Reagan Tokes Law," significantly altered the sentencing structure for many of Ohio's most serious felonies by implementing an indefinite sentencing system for those non-life felonies of the first and second degree, committed on or after March 22, 2019.

[2] Appellant, Keith, and Anthony (or collectively "the Ellisons") are brothers.

{¶3}     A trial by jury involving Appellant, Keith, and Anthony commenced on November 28, 2022.[3]

{¶4}     Appellee, the State of Ohio, presented seven witnesses: (1) Alex Wharry ("Officer Wharry"), an officer with Youngstown Police Department ("YPD"); (2) John O'Neill ("Officer O'Neill"), an officer with YPD; (3) Jason Smith ("Paramedic Smith"), a paramedic with AMR Ambulance; (4) Billy Hall, Jr. ("Billy"), the victim, who revealed that the defendants were friends of his brother, Jonah Hall; (5) Jonah Hall ("Jonah"), who indicated he was friends with the defendants; (6) Fletcher, who made a deal with the State to testify against the defendants; and (7) Michael Cox ("Detective Cox"), a detective with YPD.

{¶5}     Billy met Fletcher when they were in middle school. (11/28/2022 Trial by Jury Tr., p. 336). Billy later met Appellant, Keith, and Anthony through his brother, Jonah. (*Id.*)

{¶6}     On October 5, 2021, Billy was playing Call of Duty with his neighbor, Aliyah. (*Id.* at p. 338-339). After the game, Billy walked her home. (*Id.* at p. 339). A red Chrysler 300 with black wheels and tinted windows stopped in front of Billy's house. (*Id.* at p. 340-341). Keith exited the vehicle, approached Billy, and "shoved [him] into the car[.]" (*Id.* at p. 343). Also inside the vehicle were Appellant and Fletcher. (*Id.* at p. 343-344).

{¶7}     Keith drove them to their house on Neilson Avenue. (*Id.* at p. 345). Appellant sat in the front passenger's seat and Fletcher sat in the backseat next to Billy. (*Id.*) Billy said that Keith and Appellant were yelling about something. (*Id.* at p. 345-347). Once they arrived at the house, Keith and Anthony pulled Billy from the vehicle. (*Id.* at p. 346). Billy "started getting beaten on and punched and brutally hurt." (*Id.*) Billy tried to flee but ended up falling. (*Id.* at p. 347). Billy said Appellant, Keith, and Anthony all assaulted him while Fletcher watched. (*Id.* at p. 396).

{¶8}     Billy observed a handgun pointed at his head and the man holding it said, "I need my money." (*Id.* at p. 348-349). Billy was struck with "[a] fist and a gun in [his] face." (*Id.* at p. 353). Billy said they struck him with the gun on his face, head, and lower back. (*Id.*) Appellant, Keith, and Anthony were present and they went through Billy's

---

[3] On November 30, 2022, Appellant filed a waiver and relinquishment of his right to a trial by jury on count seven (having weapons while under disability).

pockets looking for money while continuing to assault him. (*Id.* at p. 347-350). They eventually drove Billy back to his house on Loveland Road. (*Id.* at p. 351). En route, they continued assaulting him. (*Id.* at p. 350-352). When they arrived, Billy's brother, Jonah, came outside. (*Id.* at p. 352). Keith told Jonah what was going on before the men fled the scene. (*Id.* at p. 354).

{¶9} Billy testified that Appellant, Keith, and Anthony claimed he took $300 or $300 worth of marijuana from them. (*Id.* at p. 391). Keith said to Billy, "why would you steal from me, I treat you like family." (*Id.* at p. 379-380). Billy denies stealing anything. (*Id.* at p. 381).

{¶10} Fletcher agreed to testify against Appellant, Keith, and Anthony and the State agreed to recommend a community control sanction. (*Id.* at p. 447-448).

{¶11} After Fletcher was arrested, he spoke with Detective Cox. (*Id.* at p. 449-450). Fletcher met Billy in elementary school. (*Id.* at p. 451). Fletcher met Jonah through his friendship with Billy and later met Appellant, Keith, and Anthony through Jonah. (*Id.* at p. 452-453).

{¶12} On the day at issue, Fletcher walked to a nearby gas station. (*Id.* at p. 453-454). Fletcher saw Keith in his red Chrysler 300 and asked him for a ride. (*Id.* at p. 455). Keith drove Fletcher to the gas station then to Billy's house. (*Id.* at p. 456). Appellant was also present in the vehicle. (*Id.*) Fletcher said Appellant or Keith told him they were going to Billy's house to get their money back. (*Id.*) After they arrived, Appellant and Keith forced Billy into the backseat while hitting and kicking him. (*Id.* at p. 459). Fletcher remained in the vehicle. (*Id.* at p. 458). Keith said to Billy, "you better have my money." (*Id.* at p. 460). Keith drove them back to his house a few blocks away. (*Id.* at p. 461).

{¶13} At the Ellisons' house on Neilson, Appellant and Keith pulled Billy from the vehicle and Anthony came outside and met them. (*Id.* at p. 462). Appellant, Keith, and Anthony began assaulting Billy. (*Id.* at p. 465). Fletcher said Keith went through Billy's pockets and Fletcher observed Appellant with a Glock handgun. (*Id.* at p. 462, 466). Fletcher stated that the Ellisons said to Billy, "You stole money, I need my money back." (*Id.* at p. 473). Fletcher testified that Billy tried to run away but Appellant, Keith, and Anthony grabbed Billy, assaulted him, and threw him back in the vehicle. (*Id.* at p. 467). Inside the car, Appellant, Keith, and Anthony continued to assault Billy. (*Id.* at p. 468-

469). When they arrived back at Billy's house, Appellant, Keith, and Anthony "beat [Billy] up some more in the yard[.]" (*Id.* at p. 469).

{¶14} Fletcher denied touching or assaulting Billy and denied that he assisted in setting up the assault. (*Id.* at p. 459, 469-470, 496-497). Fletcher did say, however, that he sent Keith a text message prior to the incident telling him that Billy stole from him. (*Id.* at p. 512).

{¶15} Billy's brother, Jonah, testified he was outside and saw Appellant, Keith, and Anthony exit the red Chrysler 300 and pull Billy from the backseat. (*Id.* at p. 410). Jonah saw Anthony punch Billy's face. (*Id.* at p. 411). Appellant, Keith, and Anthony began yelling at Jonah. (*Id.* at p. 412). Appellant told Jonah that Billy stole money and marijuana. (*Id.*) Keith asked Jonah where the money was. (*Id.*) Later that afternoon, Jonah asked Keith via text message how much Billy owed. (*Id.* at p. 418-419). Keith indicated, "$300," along with threats and vulgarities. (*Id.* at p. 419-423).

{¶16} Officer Wharry responded to Loveland Road. (*Id.* at p. 244). He observed Billy "in the driveway without a shirt on and he wasn't wearing any shoes; kind of beat up." (*Id.* at p. 245). Officer Wharry also observed Billy "had a bloody lip, cuts, scrapes, [on his] face, shoulders, arms." (*Id.*) Officer Wharry described Billy's demeanor as, "pretty excited, pretty worked up, pacing [b]ack and forth. Visibly upset[.]" (*Id.*) Billy told Officer Wharry "that he was forced into a car and physically assaulted." (*Id.* at p. 246). Billy said the vehicle was a red Chrysler 300. (*Id.* at p. 246-248). Billy indicated that Appellant, Keith, Anthony, Fletcher, and Myia Williams were there. (*Id.* at p. 257-258, 263).

{¶17} Officer O'Neill also responded and encountered Billy. (*Id.* at p. 272-273). Officer O'Neill stated Billy was bare-chested; had several injuries to his head and face; had wounds on his head, chest, and back; and his head was bleeding. (*Id.* at p. 273-274). Billy told the officers that "he was taken to a car by people that he knew and he had something that was owed and they ended up beating him up in the vehicle and then bringing him back to 3533 Loveland." (*Id.* at p. 276). Billy said he was put in the suspects' vehicle "unwillingly." (*Id.*)

{¶18} Paramedic Smith treated Billy's injuries. (*Id.* at p. 302, 306). He described Billy's demeanor as "[v]ery animated," "[u]pset," "[m]oving around." (*Id.* at p. 306). Billy had "abrasions to his face, his forehead, to his back and small laceration above his left

buttock." (*Id.*)  A cervical collar was placed around Billy's neck because he had multiple injuries to his head.  (*Id.* at p. 309).  Billy told Paramedic Smith "that he was abducted and struck multiple times by assailants; did not say with what or by who."  (*Id.* at p. 308).  Billy was taken to the hospital via ambulance for treatment.  (*Id.* at p. 279).

{¶19} Detective Cox conducted an investigation.  (*Id.* at p. 540).  On October 7, 2021, Detective Cox spoke with Billy and Jonah at the police station.  (*Id.* at p. 541).  Detective Cox observed Billy's injuries during the interview.  (*Id.* at p. 575).  After speaking with them, the suspects included Appellant, Keith, Anthony, and Fletcher.  (*Id.* at p. 542).  Through the investigation, Detective Cox learned that Appellant shared a news article on Facebook that referenced the incident involving Billy.  (*Id.* at p. 545).  Appellant posted on Facebook, "niggas ain't playing bout dat pape, with three cry - - laughing to the point of crying emojies."  (*Id.* at p. 546, 618-619).  Detective Cox explained that "pape" is a slang term for paper money.  (*Id.*)  One of the photographs found on Appellant's Facebook page shows Appellant with a firearm.  (*Id.* at p. 568-569).  That firearm matches Fletcher's description of the firearm used in this incident.  (*Id.* at p. 616).  Fletcher described the gun as "a desert tan brown," and thought it was a Glock.  (*Id.* at p. 611).

{¶20} At the conclusion of the State's case, Appellant moved for an acquittal pursuant to Crim.R. 29, which was overruled by the trial court.  The defense rested without presenting evidence.  Appellant's renewed motion for judgment of acquittal was overruled.

{¶21} The jury found Appellant guilty on count one (kidnapping), count two (abduction), count four (robbery), and count six (assault).  The jury found Appellant not guilty on count three (aggravated robbery), count five (felonious assault), and on all of the firearm specifications.

{¶22} On December 21, 2022, the trial court entered judgment on the verdicts, deferred sentencing, and ordered a pre-sentence investigation.

{¶23} On February 6, 2023, following a sentencing hearing, the trial court sentenced Appellant to five years (minimum) to seven and one-half years (maximum) on count one (kidnapping), five years (minimum) to seven and one-half years (maximum) on count four (robbery), and six months on count six (assault).  The court imposed the sentences concurrently.  The court merged count two (abduction) into count one

(kidnapping) upon the State's election. The court further notified Appellant that he is subject to mandatory post-release control for a period of up to five years but not less than two years.

{¶24} Appellant filed a timely appeal and raises six assignments of error.

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN CONVICTING THE DEFENDANT OF ROBBERY ON INSUFFICIENT EVIDENCE, AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PRODUCTION AT TRIAL TO PROVE A NECESSARY ELEMENT OF THE CRIME, NAMELY "THEFT."**

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN CONVICTING THE DEFENDANT OF ROBBERY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, GIVEN THAT THE PROSECUTION COULD NOT PROVIDE CONVINCING EVIDENCE OF AN UNDERLYING ACT OF THEFT, A NECESSARY ELEMENT FOR SUCH A CONVICTION.**

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN UPHOLDING A CONVICTION FOR KIDNAPPING AGAINST THE SUFFICIENCY STANDARD, AS THERE WAS INSUFFICIENT EVIDENCE OF AN UNDERLYING FELONY OR SERIOUS PHYSICAL HARM, ELEMENTS NECESSARY FOR SUCH A CONVICTION.**

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY CONVICTING THE DEFENDANT OF KIDNAPPING AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, GIVEN THE ABSENCE OF AN UNDERLYING FELONY OR EVIDENCE OF SERIOUS PHYSICAL HARM, THEREBY CONTRAVENING THE MANIFEST WEIGHT STANDARD.**

{¶25} In his first, second, third, and fourth assignments of error, Appellant argues his convictions for kidnapping and robbery are not supported by sufficient evidence and are against the manifest weight of the evidence. For ease of discussion, because these assignments are interrelated, we will consider them in a consolidated fashion.

> "When a court reviews a record for sufficiency, '(t)he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an Appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.* * *

> The weight to be given to the evidence and the credibility of the witnesses are nonetheless issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

*State v. T.D.J.*, 7th Dist. Mahoning No. 16 MA 0104, 2018-Ohio-2766, ¶ 46-48.

{¶26} "'(C)ircumstantial evidence and direct evidence inherently possess the same probative value.'" *State v. Biros*, 78 Ohio St.3d 426, 447, 678 N.E.2d 891 (1997), quoting *Jenks, supra*, paragraph one of the syllabus.

{¶27} For the reasons addressed below, we determine the judgment is not against the manifest weight of the evidence and further conclude it is supported by sufficient evidence.

{¶28} Appellant takes issue with the guilty findings for kidnapping and robbery.

{¶29} Count one, kidnapping, a felony of the first degree in violation of R.C. 2905.01, states in part:

> (A) No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> (1) To hold for ransom, or as a shield or hostage;
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;
>
> * * *
>
> (C)(1) Whoever violates this section is guilty of kidnapping. * * *

R.C. 2905.01(A)(1), (2), (3), and (C)(1).

{¶30} Count four, robbery, a felony of the second degree in violation of R.C. 2911.02, states in part:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> * * *
>
> (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
>
> * * *

(B) Whoever violates this section is guilty of robbery. * * *

R.C. 2911.02(A)(2) and (B).

{¶31} As stated, on October 5, 2021, a red Chrysler 300 stopped in front of Billy's house. (11/28/2022 Trial by Jury Tr., p. 340-341). Keith exited the vehicle, approached Billy, and "shoved [him] into the car[.]" (*Id.* at p. 343). Also inside the vehicle were Appellant and Fletcher. (*Id.* at p. 343-344).

{¶32} Keith drove them to their house on Neilson Avenue. (*Id.* at p. 345). Appellant sat in the front passenger's seat and Fletcher sat in the backseat next to Billy. (*Id.*) Billy said that Keith and Appellant were yelling about something. (*Id.* at p. 345-347). Once they arrived at the house, Keith and Anthony pulled Billy from the vehicle. (*Id.* at p. 346). Billy "started getting beaten on and punched and brutally hurt." (*Id.*) Billy tried to flee but ended up falling. (*Id.* at p. 347). Billy said Appellant, Keith, and Anthony all assaulted him while Fletcher watched. (*Id.* at p. 396).

{¶33} Billy observed a handgun pointed at his head and the man holding it said, "I need my money." (*Id.* at p. 348-349). Billy was struck with "[a] fist and a gun in [his] face." (*Id.* at p. 353). Billy said they struck him with the gun on his face, head, and lower back. (*Id.*) Appellant, Keith, and Anthony were present and went through Billy's pockets looking for money while continuing to assault him. (*Id.* at p. 347-350). They eventually drove Billy back to his house on Loveland. (*Id.* at p. 351). En route, they continued assaulting him. (*Id.* at p. 350-352). When they arrived, Billy's brother, Jonah, came outside. (*Id.* at p. 352). Keith told Jonah what was going on before the men fled the scene. (*Id.* at p. 354).

{¶34} Billy testified that Appellant, Keith, and Anthony claimed he took $300 or $300 worth of marijuana from them. (*Id.* at p. 391). Keith said to Billy, "why would you steal from me, I treat you like family." (*Id.* at p. 379-380). Billy denies stealing anything. (*Id.* at p. 381).

{¶35} After Fletcher was arrested, he spoke with Detective Cox. (*Id.* at p. 449-450). On the day at issue, Fletcher walked to a nearby gas station. (*Id.* at p. 453-454). Fletcher saw Keith in his red Chrysler 300 and asked him for a ride. (*Id.* at p. 455). Keith drove Fletcher to the gas station then to Billy's house. (*Id.* at p. 456). Appellant was also

present in the vehicle. (*Id.*) Fletcher said Appellant or Keith told him they were going to Billy's house to get their money back. (*Id.*) After they arrived, Appellant and Keith forced Billy into the backseat while hitting and kicking him. (*Id.* at p. 459). Fletcher remained in the vehicle. (*Id.* at p. 458). Keith said to Billy, "you better have my money." (*Id.* at p. 460). Keith drove them back to his house a few blocks away. (*Id.* at p. 461).

{¶36} At the Ellisons' house on Neilson, Appellant and Keith pulled Billy from the vehicle and Anthony came outside and met them. (*Id.* at p. 462). Appellant, Keith, and Anthony began assaulting Billy. (*Id.* at p. 465). Fletcher said Keith went through Billy's pockets and Fletcher observed Appellant with a Glock handgun. (*Id.* at p. 462, 466). Fletcher stated that the Ellisons said to Billy, "You stole money, I need my money back." (*Id.* at p. 473). Fletcher testified that Billy tried to run away but Appellant, Keith, and Anthony grabbed Billy, assaulted him, and threw him back in the vehicle. (*Id.* at p. 467). Inside the car, Appellant, Keith, and Anthony continued to assault Billy. (*Id.* at p. 468-469). When they arrived back at Billy's house, Appellant, Keith, and Anthony "beat [Billy] up some more in the yard[.]" (*Id.* at p. 469).

{¶37} Billy's brother, Jonah, testified he was outside and saw Appellant, Keith, and Anthony exit the red Chrysler 300 and pull Billy from the backseat. (*Id.* at p. 410). Jonah saw Anthony punch Billy's face. (*Id.* at p. 411). Appellant, Keith, and Anthony began yelling at Jonah. (*Id.* at p. 412). Appellant told Jonah that Billy stole money and marijuana. (*Id.*) Keith asked Jonah where the money was. (*Id.*) Later that afternoon, Jonah asked Keith via text message how much Billy owed. (*Id.* at p. 418-419). Keith indicated, "$300," along with threats and vulgarities. (*Id.* at p. 419-423).

{¶38} Officer Wharry responded to Loveland Road. (*Id.* at p. 244). He observed Billy "in the driveway without a shirt on and he wasn't wearing any shoes; kind of beat up." (*Id.* at p. 245). Officer Wharry also observed Billy "had a bloody lip, cuts, scrapes, [on his] face, shoulders, arms." (*Id.*) Officer Wharry described Billy's demeanor as, "pretty excited, pretty worked up, pacing [b]ack and forth. Visibly upset[.]" (*Id.*) Billy told Officer Wharry "that he was forced into a car and physically assaulted." (*Id.* at p. 246). Billy said the vehicle was a red Chrysler 300. (*Id.* at p. 246-248). Billy indicated that Appellant, Keith, Anthony, Fletcher, and Myia Williams were there. (*Id.* at p. 257-258, 263).

{¶39} Officer O'Neill also responded and encountered Billy. (*Id.* at p. 272-273). Officer O'Neill stated Billy was bare-chested; had several injuries to his head and face; had wounds on his head, chest, and back; and his head was bleeding. (*Id.* at p. 273-274). Billy told the officers that "he was taken to a car by people that he knew and he had something that was owed and they ended up beating him up in the vehicle and then bringing him back to 3533 Loveland." (*Id.* at p. 276). Billy said he was put in the suspects' vehicle "unwillingly." (*Id.*)

{¶40} Paramedic Smith treated Billy's injuries. (*Id.* at p. 302, 306). He described Billy's demeanor as "[v]ery animated," "[u]pset," "[m]oving around." (*Id.* at p. 306). Billy had "abrasions to his face, his forehead, to his back and small laceration above his left buttock." (*Id.*) A cervical collar was placed around Billy's neck because he had multiple injuries to his head. (*Id.* at p. 309). Billy told Paramedic Smith "that he was abducted and struck multiple times by assailants; did not say with what or by who." (*Id.* at p. 308). Billy was taken to the hospital via ambulance for treatment. (*Id.* at p. 279).

{¶41} Detective Cox conducted an investigation. (*Id.* at p. 540). On October 7, 2021, Detective Cox spoke with Billy and Jonah at the police station. (*Id.* at p. 541). Detective Cox observed Billy's injuries during the interview. (*Id.* at p. 575). After speaking with them, the suspects included Appellant, Keith, Anthony, and Fletcher. (*Id.* at p. 542). Through the investigation, Detective Cox learned that Appellant shared a news article on Facebook that referenced the incident involving Billy. (*Id.* at p. 545). Appellant posted on Facebook, "niggas ain't playing bout dat pape, with three cry - - laughing to the point of crying emojies." (*Id.* at p. 546, 618-619). Detective Cox explained that "pape" is a slang term for paper money. (*Id.*) One of the photographs found on Appellant's Facebook page shows Appellant with a firearm. (*Id.* at p. 568-569). That firearm matches Fletcher's description of the firearm used in this incident. (*Id.* at p. 616). Fletcher described the gun as "a desert tan brown," and thought it was a Glock. (*Id.* at p. 611).

{¶42} Contrary to Appellant's assertions, there was sufficient evidence to establish the underlying theft offense as the record reveals Appellant, Keith, and Anthony were present and they went through Billy's pockets looking for money while assaulting him. (11/28/2022 Trial by Jury Tr., p. 347-350); *See State v. Holloway*, 8th Dist. Cuyahoga No. 112129, 2023-Ohio-2387, ¶ 37-38 (finding sufficient evidence for

aggravated robbery where the defendants rummaged through the victim's pockets and vehicle); *State v. Tyus*, 8th Dist. Cuyahoga No. 108270, 2020-Ohio-103, ¶ 15-16 (finding sufficient evidence for robbery after the defendant physically attacked the victim while rummaging through his personal belongings looking for something to steal). In addition, "implicit within every robbery (and aggravated robbery) is a kidnapping." *State v. Jenkins*, 15 Ohio St.3d 164, 198, fn. 29 (1984). Here, the kidnapping facilitated the robbery, i.e., Billy was forced into the vehicle; seriously, physically harmed by Appellant, Keith, and Anthony; and went to the hospital via ambulance for treatment.

{¶43} Pursuant to *Jenks, supra*, there is sufficient evidence upon which the jury could reasonably conclude beyond a reasonable doubt that the elements of kidnapping and robbery were proven. Thus, the trial court did not err in overruling Appellant's Crim.R. 29 motion.

{¶44} Also, the jury chose to believe the State's witnesses. *DeHass, supra*, at paragraph one of the syllabus. Based on the evidence presented, as previously stated, the jury did not clearly lose its way in finding Appellant guilty of kidnapping and robbery. *Thompkins, supra*, at 387.

{¶45} Appellant's first, second, third, and fourth assignments of error are without merit.

### ASSIGNMENT OF ERROR NO. 5

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT A FAIR TRIAL AND DUE PROCESS, IN LIGHT OF MULTIPLE INSTANCES OF TRIAL COURT AND COUNSEL ERRORS, WHOSE CUMULATIVE EFFECT COMPROMISED THE APPELLANT'S RIGHT TO A FAIR TRIAL AND DUE PROCESS UNDER THE CUMULATIVE ERROR DOCTRINE.**

{¶46} In his fifth assignment of error, Appellant asserts his conviction should be reversed because of cumulative error.

Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of error during a trial deprives a defendant of a fair trial

even though each of the alleged instances of error do not individually constitute cause for reversal. *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). An error-free, perfect trial does not exist, and is not guaranteed by the Constitution. *State v. Hill,* 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996). In order to find cumulative error, a record must contain multiple instances of harmless error. *State v. Austin,* 7th Dist. Mahoning No. 16 MA 0068, 2019-Ohio-1185, ¶ 64. When an appellate court determines no error has occurred, the doctrine cannot apply. *State v. Lyons,* 7th Dist. Jefferson No. 16 JE 0008, 93 N.E.3d 139, 2017-Ohio-4385, ¶ 46.

*State v. Italiano*, 7th Dist. Mahoning No. 19 MA 0095, 2021-Ohio-1283, ¶ 35.

{¶47} As we find no error in any of Appellant's assignments of error regarding his conviction, this assignment based on cumulative error clearly has no merit. *Id.*

{¶48} Appellant's fifth assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 6

**THE PROSECUTOR COMMITTED A DUE PROCESS VIOLATION – AND THE TRIAL COURT ERRED IN ALLOWING A SENTENCE CONCORDANT WITH SAME – BY DISPROPORTIONATELY INCREASING THE SENTENCING RECOMMENDATION AFTER THE DEFENDANT'S DECISION TO EXERCISE HIS RIGHT TO A TRIAL, IMPLYING PROSECUTORIAL VINDICTIVENESS.**

{¶49} In his sixth assignment of error, Appellant claims the trial court violated his due process rights by imposing a harsher sentence in retaliation for exercising his right to a trial by jury, thereby implying vindictiveness.

{¶50} "[T]here is no presumption of vindictiveness when, after trial, a court sentences a defendant to a longer term than was offered by the state in plea negotiations." *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, ¶ 33. "The burden is on the defendant to show the judge acted vindictively." *Id.* at ¶ 3. To determine whether there is evidence of actual vindictiveness, we must "review the entire record – the trial court's statements, the evidence adduced at trial, and the information presented during the

sentencing hearing[.]"  *Id.* at ¶ 19.  "We will reverse the sentence only if we clearly and convincingly find the sentence is contrary to law because it was imposed as a result of actual vindictiveness on the part of the trial court."  *Id.*, citing R.C. 2953.08(G)(2); *State v. Marcum,* 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

{¶51}  Before trial, the State offered all three defendants, Appellant, Keith, and Anthony, a recommended term of incarceration of five to six years in exchange for pleading guilty.  (11/28/2022 Trial by Jury Tr., p. 9).  The State indicated "[t]hat offer is to the three of them and must be accepted by all three, or else the State is prepared to go to trial, to go forward with trial[.]"  (*Id.* at p. 9-10).  Appellant's counsel stated Appellant was willing to individually accept that offer and asked the trial court to enforce the plea agreement.  (*Id.* at p. 13).

{¶52}  The trial court found that because all three defendants did not accept the offer, "there has been no meeting of the minds as it relates to the potential Rule 11 agreement."  (*Id.* at p. 18).  The court concluded "that the State is not obligated to proceed with the text as it relates to the three plus two, so it's going to be the ruling of this Court that we proceed to trial as to all three defendants[.]"  (*Id.*)

{¶53}  Again, following the trial by jury, Appellant was found guilty on count one (kidnapping), count two (abduction), count four (robbery), and count six (assault).  At sentencing, the State recommended a 13-year total prison term.  (1/4/2023 Sentencing Hearing Tr., p. 8).  The State's recommendation was based on the fact that Appellant committed the same crime twice.  (*Id.* at p. 6).

{¶54}  Appellant's prior criminal record includes a juvenile adjudication for kidnapping for which he was committed to the custody of the Department of Youth Services.  (*Id.*)  The facts at trial revealed that Appellant and Keith were the ringleaders, i.e., "the ones that initially abducted and kidnapped [the] victim."  (*Id.* at p. 7).  Appellant "has experience in this type of crime [and has] demonstrated a willingness to commit the crime of kidnapping."  (*Id.*)  Appellant "has a criminal record[,]" "was arrested while he was out on bond in this case[,]" and "has another charge pending."  (*Id.*)  In fact, Appellant was later convicted of that offense.  *State v. Kyle Ellison*, Mahoning County Case No. 2022 CR 45.  The trial court proceeded to concurrently sentence Appellant to five years (minimum) to seven and one-half years (maximum) in prison.  (*Id.* at p. 41).

{¶55} The record as a whole does not show Appellant's sentence resulted from actual vindictiveness on the part of the trial court. *Rahab, supra,* at ¶ 19. Rather, the record reveals Appellant's sentence resulted from his prior criminal record, his participation in this crime compared to his co-defendants, and the impact of this crime upon the victim. Accordingly, Appellant's sentence is not contrary to law. *Id.,* citing R.C. 2953.08(G)(2); *Marcum, supra,* at ¶ 1.

{¶56} Appellant's sixth assignment of error is without merit.

## CONCLUSION

{¶57} For the foregoing reasons, Appellant's assignments of error are not well-taken. The February 6, 2023 judgment of the Mahoning County Court of Common Pleas is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

[Cite as *State v. Ellison*, 2024-Ohio-653.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**